Hearing, hearing, hearing. The United States Court of Appeals for the 11th Circuit is now open according to law. I say to the United States and its Honorable Court. Good afternoon. Please be seated. We're here for argument on Case No. 23-13396, American Securities Association et al. v. United States Securities and Exchange Commission. You're familiar with our lighting system. When the yellow light goes on, your time is starting to draw to a close, so begin to wrap up. If we take you beyond the red light, then just keep on going. You have the floor. You'll be on our time and not yours. With that, we're ready to begin. Mr. Francisco. Judge Jordan, and may it please the Court. The SEC has created a massive unprecedented surveillance tool that tracks every investor in trade from cradle to grave, all funded through a tax on every trade in America immune from congressional oversight. That order is unlawful for three reasons. First, the CAT exceeds the SEC's statutory authority. Nothing in 78K1 authorizes the creation of this massive surveillance tool, much less so with the clarity required by the major questions doctrine. And since the CAT is illegal, the agency cannot order us to pay for it. Second, the SEC's economic analysis fails to address at all the economic impact of imposing two-thirds of current CAT costs on broker-dealers because it refused to consider current CAT costs at all. Instead, it relied entirely on 2016 estimates that have proven to be wildly inaccurate and that, in turn, violated the agency's statutory duty to assess the funding order's impact on efficiency, competition, and profitability. And third, the order violates the 2016 NMS plan's requirement to establish an equitable fee structure that allocates costs between the industry on the one hand and the SROs on the other. By definition, if one group can pass their entire share onto the other, it's not allocated between them. I'd like to begin with – you can address at whatever time you think appropriate during your time. Is it your position that the CAT in any form and in every respect constitutes action in contravention of the agency's statutory authority? In other words, if you had a CAT that was scaled down by – and I know it doesn't work this way, but if you had a CAT that was scaled down by 50 percent and only had 10 percent of the costs involved in this case, would your argument be the same about lack of statutory authority? And I'm using CAT as a placeholder. That nothing like the CAT in terms of an audit trail could be established by the SEC, or is it your position that this particular version of the CAT exceeds the agency's authority? Sure. I mean, it is my position that this particular version of the CAT exceeds the agency's statutory authority. I might well argue that the scaled-down version that Your Honor suggested does too, but here we have a CAT that is unprecedented throughout all of history. You're not asking us to hold, assuming we agree with you on the first point. You're not asking us to hold that the SEC could never establish a CAT or something like a CAT. I'm certainly not asking you to hold that, Your Honor, and that's because the CAT here is unprecedented in the scope of the data that it collects, in its cost, and in the access that it gives to both the SEC and the agency. I think it's very instructive to look to a statement that was issued by the current majority of the SEC. This was issued in December 2024 before they became the current majority, but this is the statement by Acting Chairman Ueda and Commissioner Peirce back in December 2024, just a few weeks ago. The CAT is a system that one would expect to find in a dystopian surveillance state, not the shining beacon for liberty in the free world. The CAT system is expensive and essentially funded by the public, but operates outside the direct oversight or authorization of Congress. And then it continued, the commission must reflect on the costs, both monetary and societal, of the quest to have an omnibus surveillance system that tracks every investment move of its citizens. I think that statement by what constitutes a current majority of the SEC illustrates what an extraordinary thing the CAT currently is. On this issue of the privacy interest and sort of the scope of the surveillance, I guess I'm having a hard time seeing how that moves the needle on the major question issue because these are publicly traded companies on public exchanges. As I understand it, the data was always going to go to an SRO anyway. What's meaningful about the fact that this data is going to the SEC instead of an SRO? Yeah. I think it's helpful to look at how things have happened up until now. Under the pre-existing system, you have what's called a blue sheet system. And so what that means is that the SEC, if it has a particular reason to think that a particular set of trades looks off or a particular trader may have done something wrong, what the SEC does is it goes to the SROs with a targeted request and it says, show me what you got on that set of trades or that particular trader. What you have now is this massive tool that collects information on everybody, regardless of whether there's any suspicion of wrongdoing at all. And it gives the SEC and the SROs instant access to everything. If I could use an analogy. But just to be clear, and maybe I'm misunderstanding it, but I thought the SROs had access to this information pre-CAT. No. Two responses, Your Honor. First, what the SROs have access to under their own audit trails is much more limited. It does not include the type of customer information that we have here. I think that's why FINRA, one of the biggest SROs, just two weeks ago put out a statement in the form of a blog post that made clear that FINRA itself believes that the customer data portion of this database should be retired. They say it's not necessary and it raises huge privacy concerns. I'd also point you to, this is 81 Federal Register 84810, and it's a very helpful chart in the Federal Register that lists all of the existing audit trails. And it goes through and it explains what information they don't have that the current CAT does have. So it is much more expansive. And so the analogy is to essentially following a suspect around because you thought they've done something wrong, that's the blue sheet system, to installing a GPS tracker on every car in America. That is effectively what CAT does. It is a transformational use. It doesn't give you the name of the car owner in your hypothetical, right? Your Honor, the CAT certainly gives the name of the car owner. And so I guess in that sense, the GPS tracker is not nearly as intrusive as CAT is because the GPS tracker maybe doesn't. I saw from the briefs, and I haven't gone down to every bit of regulatory document, but I thought that the information that was kept omitted the name of the customer. No, Your Honor. What CAT collects is the name of the customer, the year of the birth, and then there's something else, and then additional transaction information. So it does have the name of the customer within the database. I think you may be referring to certain types of anonymization that may take place, but it's nonetheless the case that the system itself does collect the names of the customers. I think the intrusiveness of it is not just why FINRA has recently come out and said that the customer portion of the database should be retired. I think it's also why you've seen all kinds of organizations come out of the woodwork, everyone from the ACLU to former Attorney General Barr. Counsel, if I might ask a question about cost allocation and SRO pass-throughs. I take your point in the briefing about the potential inadequacy of the fee filing process before the SEC to protect broker-dealers from the fate of a 100 percent pass-through. But was the Commission's only option here to preemptively bar all pass-throughs in perpetuity? Put another way, is it your argument that nothing short of a prophylactic bar on SRO pass-throughs would have been sufficient to satisfy the APA? I think essentially, Your Honor, because I think that once you establish that the equitable allocation is one-thirds, two-thirds, as the 2016 plan requires an equitable allocation, it makes no sense to allow one party to take their, quote-unquote, fair share, to quote the regulation, and push it on to another. So, yes, I actually think the more fundamental problem, though, with the agency's economic analysis is that they did not take into account at all that under the funding order, the industry has to bear two-thirds of current CAT costs. Now, remember, everybody agrees that this order requires industry to pay two-thirds of the costs. Everybody agrees that since 2016, those costs have increased exponentially. Yet nowhere in this order does it analyze the economic impact of passing two-thirds of current costs on to the industry. The closest they come to saying is that the amount per share is small, the fees per share is small. Well, that's a total non sequitur. That's like saying that a 5 percent tax increase is small because it only amounts to 5 cents on the dollar. Nobody does economic analysis that way. Instead, you've got to assess what the aggregate impact is on the economy, and that's something that they never do in this order. So, yet, that is another reason why this is arbitrary and capricious, wholly apart from the statutory issue, and, Your Honor, wholly apart from this pass-through issue that you and I have just been talking about. Could you just play that out a little bit? Because I'm trying to figure out – I mean, question for the other side about whether that isn't arbitrary and capricious, because it sounds like it is, but I think what they would say is something like, well, it doesn't really matter what the total is because we're just allocating whatever the total figure is. We're trying to figure out what the allocation should be. So even if we were wrong about the total, it doesn't really have anything to do with the analysis that we would undergo. Well, Your Honor, I think that's quite wrong. The statute says that with respect to the funding order, this is 15 U.S.C. 78 CF. They have to analyze the impact of the funding order on efficiency, competition, and capital formation. Let me give you a very concrete example for how it could potentially have a very major impact, but we don't know because they've never done the analysis. There are certain members of this industry, Citadel happens to be one of them, that are what you call a market maker. What that means is that they essentially compete with the New York Stock Exchange. If I want to buy or sell a stock, I can go to the New York Stock Exchange or I can go to Citadel. Well, if the New York Stock Exchange can just pass its share of the costs on to Citadel, that means it gets to charge less for the same transaction that Citadel charges, clearly a potential impact on competition. Yet the order here doesn't analyze that or any other economic effect of passing two-thirds on to industry at all. And obviously, the bigger the costs are, the bigger that impact is going to be. Here, the startup costs increased from $50 million estimate in 2016 to $1 billion today. The annual costs started out at around $50 million a year. I think the CAT's most recent budget pegged at around $250 million a year. That's in perpetuity and that's growing. Assuming we disagree with you on the first argument, so now a different set of scenario for you. Could the CAT have provided that SROs recoup through some of their past sunk costs since they were the ones putting all the money in to sort of build it up before the funding order? Yes, Your Honor. We have never contested the ability of the SEC to require that the costs be shared. What my argument on this issue is that we've just been talking about is that a minimum, when they determine that two-thirds of it have to be borne by industry, at a minimum they have to assess the economic impact on that. And on my other issue, apart from the statutory question, once they decide that the equitable allocation is two-thirds, one-third, they can't then simply nullify that by allowing one side to push its entire share onto the other. One of their arguments is that that sort of a claim is premature because there are going to be these pass-through fee applications, for lack of a better term, and they are going to be able to they, the SEC, is going to be able to pass on each one of them. And then at that point, we can decide whether or not its in-practice fee structure is valid or not.  What's your response? So I have two responses to that, Your Honor. First of all, that's separate from the other two issues. So I'm going to put those other two issues to the side. Right. That's limited to that issue, yes. But on this issue, I have two responses. The first is that in the regulatory proceedings below, we argued that they should prohibit any pass-through at all. The SEC rejected that on the ground that pass-throughs were permitted. We preserved that argument. It's before you. Secondly, and wholly apart from that, the fee-filing system is wholly inadequate because it's largely immune from judicial review, as this case shows. FINRA has already passed 100 percent of its historical costs onto us. We cannot get that back. The only way to prevent that from happening in the future is through a lawsuit like this one. Did that have to go through SEC approval? Yes, Your Honor. FINRA did it? Yeah. And so the way it works is that when they file a fee filing, it becomes effective immediately unless the SEC suspends it. The SEC's decision to suspend it is not subject to judicial review. So when the SEC declined to suspend it, there was nothing we could do about it. You can't sue under the APA for agency action which could have been taken? And that's this Court's decision in the Weissman case, Your Honor. What this Court held in the Weissman case was that the agencies aren't subject to that type of lawsuit because they are entitled to regulatory immunity. And that's why the fee-filing system is completely inadequate. The only way we have for stopping this going forward is a lawsuit like this one, at least unless and until the Reisman decision is revisited. I know you're sitting here tomorrow. Maybe we can take that up.  We've got a little bit of extra time in the morning. So just a question to go back to major questions doctrine. It seems like I think the best argument on the other side that that doesn't apply here is that this is well within sort of the SEC's wheelhouse. So if you look at these Supreme Court cases, do you know Justice Barrett's kind of concurrence is really the, I think, the most fulsome effort to explain what major questions is doing? And she sort of says, look, it's kind of a common sense. You know, you kind of look at who you're giving the authority to and what that agent is supposed to be doing and that kind of thing. What do you say about that? So a couple of things, Your Honor. The first is I would say that, you know, forgiving student loans was within the Education Department's wheelhouse. Regulating emissions was within the Environmental Protection Agency's wheelhouse. If the Department of Education forgives one loan, that's not a big deal. That's not a major question. When the Department of Education forgives them all, it certainly is. Here, what the SEC has previously done is essentially had found that it had probable cause to go after somebody and then engaged in targeted requests to go after that person. What they have now is completely transformational. They have this massive database that tracks everybody in the country, regardless of whether they've done anything wrong, and gives them all of that information at the touch of a button. I think that's why, as the scope of this has become more and more clear over the years, it's been subject to much more vigorous opposition, not just by us, but by former Attorney General Barr, by half the states, by members of Congress, by civil liberties organizations. It's why this is so controversial. Again, it's essentially the difference between following a suspect around and tracking every car in America. All right, thank you very much. You've saved your time for rebuttal. Thank you, Your Honor. Mr. Matro. Good afternoon, and may it please the Court, Daniel Matro for the Securities and Exchange Commission. I have ten minutes of respondents' time, and my colleague, Counsel for Intervener, Kat LLC, has the remaining five. Kat integrates regulatory data previously available from disparate sources into a consolidated database that the SROs and the Commission depend on to safeguard today's interconnected national market system. From Kat's inception, it was understood that its costs were to be shared by the SROs and their broker-dealer members. The order under review approves changes to the Kat MS plan's model for allocating these costs. Petitioners don't seriously contest that the approved proposal, which allocates Kat costs evenly between the buyer, seller, and regulator in every transaction, is reasonable. Instead, they mostly take issue with decisions that the Commission made in past proceedings years ago or might hypothetically make in future proceedings. I want to start with the threshold obstacle to petitioners' argument that the Commission lacked the authority to require Kat's creation in the first place. Petitioners could have brought such a challenge when the Commission adopted Rule 613 in 2012 or approved the plan in 2016. But the 60-day statute of repose has long since expired, and the order here is not the kind of agency action that creates a new opportunity to bring an otherwise time-barred facial challenge. They argue in part that this is sort of a reapplication of rulemaking that took place back in 2012 or 2016, and therefore they squeak in to be able to challenge the statutory authority of the agency. And that argument doesn't work because the order here doesn't enforce or imply or apply any Kat provisions against petitioners. It simply approves, under Rule 608, an amendment to the Kat MS plan's general framework for allocating Kat costs. And that's what fundamentally distinguishes this case from the consumer's research case that petitioners rely on. There, the challenge was to the regulatory framework for determining a particular regulatory fee. And the challenged order there did not just simply amend that regulatory framework. It determined specific fee amounts pursuant to those regulations that were challenged and triggered the challenger's obligation to pay them. That's very different from the situation here. The order here doesn't approve any particular fee or any other obligation on petitioners. That happens in the distinct fee filing process. But in essence, it sets up the fee structure. It sets up the fee structure. It sets up or it modifies the fee structure in the same way that whenever an agency amends a rule, it amends the regulatory framework in a way that could increase or decrease burdens on particular market participants. But that's not enough. And why isn't that enough, I guess? And I don't want to belabor this, but, I mean, just looking at it from a practical perspective, if the Kat comes out and it's not specific about who has to bear the cost of the Kat, there are probably all sorts of market participants and potential plaintiffs that would not want to challenge it. They just don't care. They don't know that it's necessarily going to affect them. But then you come in and you have this rule that now says, these are the people who have to bear the cost. Why can't they challenge it at that time? It seems odd to say you can adopt the framework without expressing who is going to impact, and then once you later adopt the impact, it can't be challenged. Because in 2016, when the Commission approved the plan, it approved the decision was made both to incur the cost of Kat and to split the cost of Kat between broker-dealers and SROs. That was never in doubt. It was always that the cost would be split, and indeed in the 2016... It was always that they were going to have to bear some amount of the cost. Is that what you're saying? It was always clear that broker-dealers, and indeed every broker-dealer under the 2016 plan, was likely to have to bear costs. And so there's no question that petitioners knew that Kat was going to affect them and had the opportunity to bring an argument that it was unlawful. But not only did they not do that, but they largely expressed support for the concept of a consolidated audit trail. And so... If that's the contention, is the funding aspect of the Kat, the recent orders, is that severable? Is it severable from... The Kat itself. You mean if you thought that... Let's assume you are right, that the statutory authority argument isn't properly before us because it should have been raised long ago and was not. Assume for the sake of argument that you are correct on that point. But assume that the petitioners are right and that we agree with them that allowing a 100% pass-through, at least theoretically for the SROs, is not an equitable way of allocating fees, expenses, charges, et cetera. What's the remedy? Well, so if you were to find that this particular order was unlawful or unreasonable under the APA, then I think the proper remedy would be to remand with the ICATOR because the commission would be able... If the concern is about the commission's explanation of the pass-through issue, that could be remedied on remand without disrupting the funding allocation that petitioners don't even protest. Right, but take it one step further. Assume that it's not the lack of explanation. I didn't make this clear before, but I'll do so now. Assume that the problem is not the lack of explanation by the agency about why it shows this particular mechanism or the breakdown of two-thirds, one-third, et cetera. It's that the two-thirds, one-thirds with 100% pass-through capability is not an equitable way under the Exchange Act of allocating fees, charges, et cetera, et cetera. Then what's the remedy? If the courts were holding that the commission had to preemptively prohibit a rule out the possibility of pass-through... No, no, of 100% pass-through. ...of 100% pass-through, then the commission could do that on remand. I want to take the opportunity, if I might, to address the premise of the question, which is that the commission somehow blessed that, which is... Well, theoretically, and then I'll let you answer it. I'll give you some more time. But theoretically, the order under review allows for 100% pass-through upon application, but it allows it, right? It doesn't allow it. It just doesn't rule it out. It says that any attempt at pass-through would have to satisfy statutory requirements that the SRO demonstrate that doing so was consistent with the Act. Right. The concern I have, and then this will be my last question so you can then answer the argument by the petitioners. The concern from my end is that this possibility for a pass-through exists theoretically into perpetuity. It's not limited to past sunk costs or even a percentage of costs going forward until someone reaches the break-even point as to past contributions. It theoretically goes on for the next 100 years if the cap remains in place, so that the SROs theoretically may not pay a single cent going forward if the SEC doesn't stop them, right? It doesn't prejudge the outcome of hypothetical future attempts by the SROs to impose their share of costs. Only FINRA has done that so far. And I think the point is the commission has found that the allocation that it approved, the one-third, one-third, one-third allocation is reasonable. That's the allocation that the SROs are now collecting under. A future fee filing that seeks to pass through an SRO's own costs would have to justify imposing costs that the plan allocates to the SRO on the SRO's members. The order recognized that FINRA uniquely would likely have no choice but to do that because it is a nonprofit funded by its members. But it also recognized that the SRO exchanges are differently situated and that they're for-profit entities with multiple lines of business operating in competitive environments with profits to pay for their costs as well. And nothing that the commission said in the order suggests that they, too, will simply be able to, that it would be equitable and reasonable for them to do so. All the order declined to do was it declined the request to preemptively state that under no hypothetical circumstances ever in the future would that be permissible. Again, no exchange has tried to do that. And while I can't prejudge how the commission would rule, I think it would likely consider whether the exchange SRO identifies any particular circumstances that would justify making the members, the exchange's members, pay for costs that the plan specifically allocates to the exchange. Counsel. Can you give him, I'm sorry. No, no. Can you give him four more minutes, please? Thank you. One of the critiques that the petitioners have of this future fee filing process is that it would be narrowly focused on a specific fee request and, therefore, it wouldn't really consider the market-wide allocation formula. So what's your response to that critique? Well, I think the commission would have to do that. And so, for example, a rationale by an SRO exchange that would apply to every other exchange is going to probably be a lot less persuasive to the commission because approving that would suggest that, you know, the same would apply to a pass-through of all SRO exchange costs. So the commission is likely, again, I can't prejudge, but going to be looking for are there unique circumstances that justify departing from the plan's allocation that's been approved and imposing costs that the plan contemplates the exchange to incur on their members. But, again, the question is whether leaving open that possibility, subject to a statutory process that requires careful commission review, renders this order unreasonable. And I don't think anything required the commission to do that or prohibit it from leaving open that possibility. Could you address the fact that the order relied on the 2016 estimates of cost instead of the 2023 knowledge about how much it costs? Yeah, I mean, I think that's just incorrect when you look at the order's analysis across the board on efficiency, competition, and capital formation. The order looked at considered recent cost data as well as other recent developments, and in particular, it discussed the growth in CAD costs that the petitioners are talking about in multiple ways. It discussed the drivers behind those costs, the uncertainties that made it difficult for the commission to project, to reliably project how they would develop over an extended period and the reasons why there would be adequate incentives to control those costs under the new funding model. And then specifically, it used recent cost data. It didn't rely on the 2016 data. It used recent cost data that included the increase in costs to estimate the likely size of CAD fees on a per-share basis in order to assess the potential effects of those fees on broker-dealers and investors. And it found that even with the growth of costs that petitioners are talking about, the likely CAD fees would likely be less than 1,000th of a penny per share, orders of magnitude smaller than existing transaction costs and fees, and thus unlikely to have a significant impact on efficiency, competition, and capital formation. And I think the commission's use of a per-share analysis was entirely reasonable. It's entirely reasonable to assess a per-share transaction fee, the effects of a per-share transaction fee, by estimating the size of that fee and comparing it to existing fees. And again, that analysis didn't suggest that the aggregate amount is meaningless or insignificant. Can you address, on the major questions, Dr. Nishiu, can you address the argument from the other side that there's a meaningful difference between the data that was previously gathered by the SROs and could be reported to the SEC versus the kinds of personal information and data that's going to be gathered on this CAD? In terms of the type of data, there is not. The commission required the SROs and broker-dealers to maintain all of the same types of data before CAD. And with respect to customer data, personal data in particular, the commission has long had, before CAD, long had access to a broader scope of customer data than CAD collects. CAD collects a limited set of data. The fact that CAD can now access a subset of that information more efficiently doesn't somehow fundamentally change the nature of the regulatory scheme or the authority underpinning it. And the reason CAD was created precisely because the SROs needed direct access to a consolidated version of the data that was already available in order to effectively oversee cross-market trading. And so the question is whether the Exchange Act permits the commission to have access to that data on the same terms as the SROs. And it just clearly does. Section 17A grants the commission broad access to the data collected from the SROs and broker-dealers. And access to that data is necessary for the commission to effectively fulfill its own obligations in overseeing SRO functions. To go back to the funding issue one last time, this is my final question on the point. You say in part in the brief that the challenges to the potential 100% pass-through availability for SROs is sort of premature and that the process needs to be allowed to run its course and the SEC can take into account the propriety of allowing such pass-throughs if and when those fee applications are submitted. But one of the arguments on the other side is that there's no review mechanism for whatever the SEC does when those fee petitions are submitted. And so the issue has to be decided now or it will never be decided. Could you respond to that briefly? Yes, I do. Thank you. I'd like to address that point. There is judicial review when the commission chooses to suspend a fee filing and subsequently issues an order. The commission can and does suspend filings when appropriate. It's also true that Congress has, for other reasons, limited judicial review of non- But when it suspends a fee filing, that will be agency action that can be objected to by the aggrieved party, which is probably the SRO, right? When it issues an order following the suspension. So the commission can suspend and then institute proceedings and then it issues either an order approving or disapproving. Right, but if it doesn't do anything. But if it doesn't suspend, you're right. It's the D.C. Circuit. The D.C. Circuit has held that, interpreting the Exchange Act, that Congress limited judicial review of those non-suspension decisions. But as the D.C. Circuit also recognized in Bloomberg, that doesn't mean that the commission has to preemptively decide the reasonableness of all future fee filings when it approves any SRO initiative. As the court in Bloomberg explained, the commission has a statutory obligation, still has a statutory obligation, to ensure that proposed fees are consistent with the requirements of the Act. And its power to suspend those fees is a meaningful check. And a petition for rulemaking exists as a meaningful remedy as well. The D.C. Circuit has held even in the event of a non-suspension decision. We've taken you way over your time, but you can have a minute to wrap up. Thanks. Thank you. So I guess the last point I would make is, you know, what Congress contemplated in 1975 was that the commission would use its authority to develop a thriving linked national market system subject to effective regulation. And Congress recognized that, you know, as the barriers to cross-market trading came down, regulatory gaps could emerge in a system where individual SROs were responsible for regulating their individual markets. So while Congress may not have had CAT precisely in mind, it absolutely did contemplate precisely the type of regulatory gap that CAT responds to and granted the commission authority to address it. And again, I think the absence of any controversy over that and the market consensus around CAT's creation at the time it was created supports that. And we think the order's allocation of costs is plainly reasonable and would urge the Court to affirm that, deny the petition for review. All right. Thank you very much. Thank you. Mr. Gershengorn. Good afternoon, Your Honors, and may it please the Court. Ian Gershengorn for CAT, LLC. I'm going to focus my attention on the arbitrary and capricious side of things. As the SEC noted, it decided here that CAT could collect its historic and current costs by dividing those costs equally among the three principal parties to the transaction, the buyer, the seller, and the SRO as market regulator. That decision, which stops buyers and sellers like Citadel from free-riding and allocates to them a proportionate share of the costs of providing safe and secure markets, is eminently reasonable and, I gather, effectively not challenged here. At the same time, the SEC deferred a distinct question whether the SROs, having paid to CAT their one-third share, can recover that payment from their users. The broker-dealers, of course, are free to pass on their share to their users. The SROs require SEC approval. And on that issue, the SEC chose to evaluate an SRO's CAT-related fee request just as it evaluates every other SRO fee request, reviewing specific fee filings by individual SROs when they seek to recover their regulatory costs. Now, I heard this morning three arguments that you ---- I heard this morning three arguments that you made that the regulations are not limited to past costs paid, right? No, Your Honor. They're limited to both past and current. And I'd like to address, I think, the three issues which I hear from Mr. Francisco and from the bench this morning. They had to decide now the costs were high and essentially the Rule 19 proceedings were shammed. I'd like to address all three and then hit remedy. So they had to decide now. The Commission explained why it didn't, and it was reasonable in so doing. It said we have a process for doing this. We should use that. It identified the specific reasons why an SRO might not pass on or get full recovery. It said SROs complete, compete. They might not pass on their one-third share. They said there are milestones which might not be reached. Those may not be passed on. They said there's a budget review that may decide the costs are unreasonable. It may not get passed on. And then the Commission, of course, always retains its discretion to see whether things are equitable and reasonable. But then the Commission went a step further and said even assuming everything gets passed on, the costs are small, both as an absolute matter and as a relative matter. And that expressly addressed the idea that what happens if we pass that on. So I think the Commission was perfectly reasonable to decide to hold on and use the standard Rule 19 proceedings. So what does small mean in the aggregate? So, Your Honor, the question, the court or the Commission addressed that. It's at A259-62682. What it said was we're talking on the order of a thousandth of a cent. They said it was small relative to the other fees which are already being imposed. And then contrary to Mr. Francisco and going straight to this question of historical versus current costs, they expressly address on page A259 of the appendix in footnote 1102 both historic and current historical fee rates. The Commission does not expect fee rates to be significantly larger than the current fee rates to be significantly larger than historical fee rates because the historical fee rates will cover a longer period of time than cat fees and cover a broader scope of activities than cat fees. So they addressed both historic and current and found that they were small both in absolute terms and in relative terms. So I think in terms of delaying and deferring, the SEC explained why and it was reasonable. In terms of cost, again, the Commission could not have been clearer that it looked at both absolute costs and relative costs, both current costs and historic costs, and found them to be small, both as an absolute and relative matter, and that the effect on things like efficiency, competition, and investment in capital would be small. What they found was the fees are, quote, unlikely to be large enough to affect overall competition. They found that the fees, there would be, quote, insignificant effects on capital formation. That's at page A253, 62676 of the order. The final set of issues before I hit remedy is that somehow this Rule 19 process is effectively a sham. So first of all, that's not the usual presumption we make of government agencies that are regulating in an area. Second, the history of the Rule 19 proceedings, both here and in prior, show that the Rule 19 proceeding is not a sham. In the last five years, the Commission has rejected fee filings from NASDAQ, from the New York Stock Exchange, from Box and others. And remember, in this very proceeding, in the filing that led to the stay application that this court decided, or this court, maybe not this family, but this court decided, the SROs had made a fee filing. The SEC suspended it. It was withdrawn and then resubmitted with $20 million taken off. So the idea that this is a sham just is not supported by the record. Then you get to judicial review. As the SEC counsel said, if they suspend, Judge Jordan, to go to your question, both the SEC or Citadel — both the SROs or Citadel — Robertson, give him another minute and a half, please. Thank you, Your Honor. Both the SEC — both the SROs or Citadel, the Citadels of the world, depending on whether the SEC approves or disapproves, can sue. It is correct that if the SEC just lets the filing after public comment go in, there is no judicial review. But again, A, Congress provided for that. B, the S — the D.C. Circuit addressed that expressly and said, yes, but you can file a petition to amend the fee filing, and that is subject to judicial review, that it would — the decision not to address that would be agency action that's subject to judicial review. So this is not some novel procedure that nobody has thought about. The D.C. Circuit has articulated exactly the review process that would go. So the idea that it is a sham process, that review, just isn't supported by the record. I would like to address, Judge Jordan, you asked about remedy. I just want to echo what counsel for the SEC said, that if the Court were to be troubled by the refusal to bar pass-throughs, the right answer would be remand without vacatur. Remember, at the moment, the SROs have paid — at the time of the order, had paid 100 percent of the fees. The reason for that delay and the — why they keep paying fees is, of course, that despite the fact that everybody understood the broker-dealers were going to be — pay their share, and despite the fact that the 2016 order had suggestions from commenters that that might be up to 80 percent of the total cost, that they nonetheless delayed and allowed those costs to accumulate. And, you know, even if Your Honor thought that they had — the SEC had to bar pass-through, that would be the kind of thing that could be fixed on remand. And so it would absolutely be the case that remand without vacatur is important. If I can make a final — you've been very generous. If I can make one final point on costs, I'll be very brief. The SEC addressed spiraling costs. It found that those costs were affected not by gold plating or other things, but by the complexity and volume of trading of the citadels of the world. Instead of 50 million records a day, we're at 420 — I'm sorry, 50 billion records a day. We're at 420 billion records a day. And that explains the spiraling cost. When you're doing that on a per-trade basis, Your Honor, the effect on competition and capital formation is, as the SEC found, minimal. Thank you, Your Honors. All right. Thank you very much. Your Honor, I'm going to try to hit five quick points, but I'm obviously happy to answer any questions that you all have. The first point is, I note that CAT LLC doesn't defend the agency's statutory authority here. While the SEC does, its principal arguments seem to be that our challenge isn't timely. That's clearly wrong. What we're challenging here is the funding order, the challenge to the funding order. No, but that seems collateral to the CAT itself, and that's what I asked you about at the beginning, whether or not the SEC could create some sort of a CAT that wouldn't be beyond its statutory authority. And you were, of course, not willing to concede that, but you didn't — you said that the argument here was different because it was built on this funding model. And what I'm saying is that because this CAT is illegal, we can argue that they're not allowed to force us to pay for this CAT. And that's what we're challenging in the case. Their assertion that we can be required to pay for any portion of this CAT,  But that just seems completely collateral to the creation of the CAT itself. It's the funding mechanism. And the reason it's not, Your Honor, is that once you're challenging final agency action, you can bring any argument you want and challenge that final agency action. It's exactly what this Court did in the consumers' research case. Yeah, it's not exactly the same, but it's close. It's close. It's pretty darn close. And the whole point of consumers' research is you have final contribution factor. There was a timely challenge to the contribution factor of final agency action. And therefore, you could bring any argument against the application of that contribution factor, including that it was created by an agency that was unlawful in the first place. But it can't be the case that every single time that an agency tweaks a rule that has been in place for 10 years without challenge, that any tweak can bring up a challenge to the statutory authority in the first place. That makes no sense. And everybody in the industry, from the briefs, I think everybody agrees on this point, at the time of the initial discussion of the CAT and the initial creation of the CAT as it existed back in 2012 and 2016, no one uttered a peep. No one said this is a problem. And if I could address that, Hedda, and I think that's because as the years have gone on, this has increased both in cost and in scope. I think that's precisely why FINRA has now come out and said that it opposes a major portion of the CAT, even though it was in on it from the beginning. I know, but the problem is that federal law gives you 60 days, generally speaking, to challenge something like the CAT, and it wasn't challenged. And, Your Honor, if we were bringing a direct challenge to the CAT, that would be directly on point. That is what you're bringing. You're saying that there's no statutory authority for the CAT as is currently created. That's a challenge to the CAT. And, Your Honor, there are challenges, too, and the only thing we're asking you to set aside is the funding order. Again, that's exactly what happened in the consumers' research case. So the argument is that the funding order is outside the statutory authority or that the CAT is outside the statutory authority? It's that the funding order is outside of the statutory authority because it is ordering us to pay for something that is also outside of the statutory authority. You're arguing, your brief, your brief is not phrased that way. Your Honor, your brief is the CAT is outside of the SEC's statutory authority. So respectfully, Your Honor, our argument... Isn't that like the lead sentence in the initial argument, Roman numeral one? Your Honor, I'd like to be quite clear on this. Our argument is that the funding order is unlawful because it is ordering us to pay for something that is itself unlawful. Both the funding order and the CAT are based on the same statutory authority. Because you can't force us to pay for something that is illegal, that makes the funding order unlawful. And that's why the only remedy that we're seeking here is setting aside the funding order. Had we come in and asked you to set aside the CAT, I think their arguments would be much better taken. Can you give me the blue brief, please? But consumers' research addresses this very situation because in that case, the parties were coming in years after the private corporation was created to challenge the latest fee determination by the private corporation, not directly challenge the private corporation itself. And in consumers' research, this Court held that that was a timely challenge. I don't want to belabor this issue, and I appreciate Your Honor's giving me a couple more minutes because there are a couple of other smaller points that I did want to hit. The next one... But you're over your time, and I've taken you over your time, so you've got two more minutes. I'm sorry, Your Honor. I misread the clock. I thought you would add... It happens all the time. It happens to us, too. Thank you. Second point. The funding order clearly allows a 100 percent pass-through. We know that to a metaphysical certainty because it's now already happened. They have actually authorized FINRA to pass through 100 percent of its historical costs. So we know that the order allows this. We also know because I think my friends effectively conceded that it is, you know, largely immune from judicial review because every time the agency declines to suspend a fee filing, there's nothing we can do to challenge it. That's exactly why in the regulatory proceedings below, we argue that they should prohibit pass-throughs. They rejected that request. We're allowed to challenge their rejection of that request. Let me tell you why I thought that your brief was phrased a little bit more broadly, and you're always allowed to retreat. Page 12, summary of the argument, first two sentences. The court should vacate the order, period. The cat itself exceeds the commission's statutory authority. That seems broader than attacking just a funding mechanism. Well, your Honor... That's the way I read it. Sure. That doesn't mean the reading is right. I just want to be clear, though. The only relief that we're seeking is asking you to set aside the funding order. Sure, but the reason... But relief isn't always consonant with the legal theory behind it. Well, your Honor, I think the relief we're seeking... You're right. I don't want to fight you on this because I don't think we really disagree. You are right that the heart of our challenge is that because the cat itself is unlawful, that taints the funding order because you can't force us to pay for something that is unlawful. But our challenge is to the funding order. That challenge is timely even though the theory reaches back. That's exactly what happened in the consumers' research case. The challenge was to the most recent fee determination by the private corporation at issue with that case, even though the theory for why that latest fee determination was illegal reached back many, many years to the original creation of the private corporation itself. That's essentially what you have here.  You've got 30 seconds to wrap up. Your Honor, the last point I want to make is on the economic analysis. Here, the order clearly requires the industry to pay for two-thirds of that economic analysis. My friends pointed to various parts in the record where they believed that the agency actually addressed the increased costs. I'd encourage you to actually look at all of those sites because we did. They fall into one of three buckets. One, they note that costs have, in fact, increased. We all agree on that. Two, they explain why, in their view, the costs have increased. That's really here near there because, three, what it does not do is assess the aggregate impact of those costs on economic efficiency, capital formation, and competition. The only thing that it does, and I didn't understand them to say otherwise, is to note that on a per-share basis, it is a relatively small amount. Well, these are shares that are traded in the trillions. A relatively small amount, when you carve it into a per-share basis, translates into very big numbers. We don't know if it would impact the economy because they never assessed whether it would impact the economy. And so wholly apart from these big statutory authority questions that we're talking about, Your Honor, that is yet another reason, and frankly, a quite narrow one, for why you ought to set aside this funding order, and that is what we ask that you do. All right. Thank you very much. Very helpful. We're in recess.